## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| DAVID TIPLER, | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:18-CV-2245-B (BH)** |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge[1]** |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

David Tipler (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1; 14.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further proceedings.

### I.  BACKGROUND[2]

On March 5, 2015, Plaintiff filed his application for a period of disability and DIB, alleging disability beginning on May 27, 2014. (doc. 11-1 at 155-58.) His claim was denied initially on May 13, 2015, and upon reconsideration on September 8, 2015. (*Id.* at 78, 92.) On October 8, 2015, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 107-08.) He appeared and testified at a hearing on February 16, 2017. (*Id.* at 52-69.) On June 6, 2017, the ALJ issued a decision finding him not disabled and denying his claim for benefits. (*Id.* at 29-51.)

---

[1] By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on August 2, 2017. (*Id.* at 150-54.) The Appeals Council denied his request for review on June 25, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-11.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.    Age, Education, and Work Experience**

Plaintiff was born on October 13, 1963, and was 53 years old at the time of the hearing. (doc. 11-1 at 55, 155.) He completed two years of college and could communicate in English. (*Id.* at 55, 169.) He had past relevant work as a heavy delivery driver. (*Id.* at 66.)

**B.    Medical Evidence**[3]

On May 27, 2014, Plaintiff presented to Texas Health Huguley (Huguley) with a back injury. (doc. 11-1 at 396-97.) A thoracic spine X-ray showed no acute fracture or subluxation.[4] (*Id.* at 397.) The following day, he presented to Gregory Gardner, D.O., for an evaluation of his back injury. (*Id.* at 448.) He reported that he worked as a delivery driver for United Parcel Service (UPS) and had injured his back when he caught a 130-pound package that had fallen off a dolly. (*Id.*) He immediately experienced a burning sensation and severe pain in his mid-back, and he also reported numbness and tingling to both hands. (*Id.*) He rated his current pain level as an 8 out of 10. (*Id.*) Dr. Gardner noted limited trunk rotation of 30 degrees to the left and 45 degrees to the right, focal point tenderness at the left and central T4,[5] and decreased strength of the trunk at flexion and

_____

[3] Because the ultimate resolution of this case is based on Plaintiff's physical impairments, it is unnecessary to recite the psychological and psychiatric evidence.

[4] Subluxation is an incomplete or partial dislocation of a bone in a joint. *Subluxation*, THE AMERICAN HERITAGE MEDICAL DICTIONARY (2007).

[5] The twelve vertebral bodies of the thoracic spine are labeled T1 through T12, and make up the bony building blocks of the spine. Thomas Scioscia, M.D., *Vertebrae in the Vertebral Column*, VERITAS HEALTH (Aug. 24, 2017), https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column.

extension. (*Id.*). Plaintiff's thoracic spine X-ray showed no compression or wedge fractures and exhibited "good alignment." (*Id.*) Dr. Gardner diagnosed thoracic sprain/strain and thoracic spasms. (*Id.*) He prescribed Norco for the back pain and recommended rehabilitation therapy. (*Id.* at 449.)

On June 2, 2014, Plaintiff had a follow-up appointment with Dr. Gardner. (*Id.* at 447.) He complained of continuing "burning" back pain, and numbness and tingling to both hands, and he rated his pain as a 7 out of 10. (*Id.*) Plaintiff's clinical findings were generally unchanged, and Dr. Gardner's initial diagnoses remained the same, but he also added the differential diagnoses of occult compression fractures and internal derangement of the thoracic spine. (*Id.*) The following week, Plaintiff reported that his symptoms and pain level had not changed. (*Id.* at 446.). Dr. Gardner noted that a spinal computed tomography (CT) study was needed to rule out a compression fracture, but he recommended that Plaintiff could return to work "with restrictions." (*Id.*)

On June 10, 2014, a CT of Plaintiff's thoracic spine showed minimal degenerative anterior endplate spurring of the upper thoracic spine, but no acute fracture or subluxation. (*Id.* at 336.) It was noted as an otherwise "normal CT of the thoracic spine." (*Id.*)

Plaintiff attended twelve physical therapy sessions at Total Injury Care in June 2014. (*Id.* 271-318.) On June 4, 2014, he reported his pain as a 7 out of 10, and was "walking very stiff and sore." (*Id.* at 315.) Mild to moderate spasms were noted in the thoracic spine, but his range of motion had increased since his initial session. (*Id.*) Plaintiff reported at his next two sessions that his pain level had been decreasing, (*id.* at 307, 311), but he reported increasing pain at a subsequent session on June 9, 2014, (*id.* at 303). On June 11, 2014, he stated that the exercises had been helping increase his flexibility, but he continued having "spasm[s] bilaterally in the thoracic spine with bilateral rhomboid trigger points." (*Id.* at 299.) At his next appointment, Plaintiff reported

increased pain and was tender at the spinous processes between T4 and T9. (*Id.* at 295.) On June 16, 2014, his pain had decreased, and he stated that "the therapy is helping but only mildly." (*Id.* at 291.) On June 20, 2014, Plaintiff's pain level had increased to an 8 out of 10, and he was not sleeping well because of cramps in the mid-back muscles. (*Id.* at 283.) At his final therapy session, he reported some decrease in pain, but still had mid-back cramping and morning stiffness. (*Id.* at 271.) He had continued experiencing moderate spasms in the thoracic spine, but was noted to have improved since his last session. (*Id.*) His range of motion had increased during this session. (*Id.*)

Plaintiff met with Dr. Gardner again on June 12, 2014, June 30, 2014, and July 7, 2014. (*Id.* at 441-44.) At each appointment, he rated his pain level as a 7 out of a 10. (*Id.*) On June 12, 2014, Dr. Gardner noted that the recent thoracic spine CT did not show compression fracture, but Plaintiff was "unable to contain pain and spasms in the thoracic spine." (*Id.* at 444.) He referred him to a pain management specialist for further evaluation and possible epidural steroid injection. (*Id.*) At his next two appointments, Plaintiff reported not sleeping due to pain. (*Id.* at 441-42.) He also stated that his back pain radiated to his right upper extremities and that he had numbness and tingling to the right hand. (*Id.*) Dr. Gardner noted decreased right hand grip strength, as well as decreased sensory to the fifth finger of the right hand. (*Id.*)

On July 1, 2014, a thoracic spine MRI showed a benign hemangioma within T2 and a small dorsal disc osteophyte[6] complex at T2-T3, but no acute fracture or destructive marrow lesion. (*Id.* at 335.) The spinal canal was generally narrowed on the basis of short pedicles, which was

---

[6] "Osteophytes—better known as bone spurs—are small, smooth bony growths that may develop near the edges of a vertebral body's endplates (called spondylophytes) or the spine's facet joints where cartilage has worn." Stewart G. Eidelson, M.D., *Osteophytes (Bone Spurs)*, VERTICAL HEALTH (Mar. 15, 2019), https://www.spineuniverse.com/conditions/spondylosis/osteophytes-bone-spurs.

exacerbated by multilevel disc disease, worst at C5-C6[7] with a distal protrusion measuring 4mm, and which resulted in mild to moderate spinal stenosis.[8]  (*Id.*)  There were also small disc protrusions at T6-T7, T7-T8, T8-T9, and T9-T10. (*Id.*)

On July 23, 2014, Plaintiff presented to Mike Shah, M.D., P.A., for pain management consultation.  (*Id.* at 252.)  He reported his pain, which was sharp, shooting, and stabbing, and wrapped around the mid axillary line, as a constant 7 out of 10.  (*Id.*)  He also had stiffness of the lower midback region and occasional pain over his shoulder blade, numbness and tingling in his arms (more right than left), and occasional neck pain.  (*Id.*)  His thoracic spine examination showed limited range of motion for extension with greater rotation compared to flexion, and some pain with facet loading.  (*Id.*)  Dr. Shah observed tenderness around T5-T6 and T6-T7 on the paraspinal region, but no step-off or paraspinal atrophy.[9]  (*Id.*)  Neurologic examination was intact for light touch from T1 to T12, except for T5-T6-T7.  (*Id.*)  Plaintiff demonstrated intact motor strength in the upper and lower extremities, as well as symmetric reflexes.  (*Id.*)  Dr. Shah opined that his mid-back pain was from a sprain of the middle level "given his clinical examination and symptoms, mechanism of injury and diagnostic studies."  (*Id.*)  He recommended injection therapy, especially given the exhaustion of Plaintiff's other conservative measures, which would be both diagnostic and therapeutic. (*Id.*)

---

[7] The cervical spine (i.e., the neck) comprises of seven vertebrae labeled C1 through C7, which begins at the base of the skull and extends down to the thoracic spine.  Paul J. Slosar, M.D., *Cervical Vertebrae*, VERITAS HEALTH (Aug. 19, 2016), https://www.spine-health.com/conditions/spine-anatomy/cervical-vertebrae.

[8] Spinal stenosis is a narrowing of the channel for the spinal cord and nerve roots. *Spinal Stenosis*, JOHNS HOPKINS MEDICINE (Apr. 30, 2019, 10:08 AM), https://www.hopkinsmedicine.org/health/conditions-and-diseases/spinal-stenosis.

[9] Atrophy is the "wasting of tissues, organs, or the entire body, as from death and reabsorption of cells, diminished cellular proliferation, decreased cellular volume, pressure, ischemia, malnutrition, lessened function, or hormonal changes." *Atrophy*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014.)

On July 24, 2014, Plaintiff presented to Dr. Gardner for a functional capacity evaluation (FCE).  (*Id.* at 328.)  He stated that any bending or use of the upper back increased his back pain, but rest and medication helped decrease it.  (*Id.* at 330.)  He also described symptoms of joint pain and joint swelling, and weakness and sensory changes of the upper body.  (*Id.*)  The symptoms caused him difficulties with bathing, dressing, sitting, lying down, standing, driving, riding, grasping, sleeping, and sexual activity. (*Id.*) Testing demonstrated hypoesthesia[10] of the right upper extremity dermatomes[11], and limited bilateral upper extremity deep tendon reflexes. (*Id.* at 330-31.) Thoracic examination showed decreased range of motion and "sharp ache pain."  (*Id.* at 324.)

Functional specific testing produced incomplete results in right leg balancing, crawling, crouching, overhead reaching, squatting, and stooping.  (*Id.*)  Plaintiff was able to perform left leg balancing, kneeling, shoulder level reaching, sitting for 15 minutes, standing for 30 minutes, and walking for 10 minutes, but each task caused increased pain.  (*Id.*)  He self-terminated cardiovascular treadmill testing and dynamic lift testing due to increased pain.  (*Id.* at 331-32.) Hand grip testing showed a 14 percent strength differential between his left and right hands, with the right being weaker.  (*Id.* at 332.)  Pinch grip of his left hand was 13 percent stronger than his right hand.  (*Id.*) Vertebral fixations, trigger points, and muscle restrictions "in the area of injury" were observed.  (*Id.* at 332.)  Based on the objective findings from the testing, Dr. Gardner opined that Plaintiff did not "meet the requirements, safety, and performance ability to do [his] job safely, effectively, and confidently (without restrictions)."  (*Id.* at 333.)

---

[10] Hypesthesia, or hypoesthesia, means diminished sensitivity to stimulation. *Hypesthesia*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

[11] "A dermatome is the area of sensory nerves near the skin that are supplied by a specific spinal nerve root," which "are useful for finding the site of damage to the spine." *Dermatome Definition*, VERITAS HEALTH (Apr. 30, 2019, 10:19 AM), https://www.spine-health.com/glossary/dermatome.

From August 4, 2014 to April 27, 2015, Plaintiff had several follow-up appointments with Dr. Gardner. (*Id.* at 420-40.) His pain level ranged between a 6 and 7 out of 10. (*Id.*) On August 4, 2014, he reported that his thoracic spine pain was not improving. (*Id.* at 440.) On September 2, 2014, he complained that his back pain was unchanged. (*Id.* at 437.) In October 2014, Plaintiff continued experiencing numbness and tingling to the right upper extremities, and burning of the right hand due to loss of sensation. (*Id.* at 433.)

On September 16, 2014, Plaintiff underwent a fluoroscopically guided bilateral T5-T6 epidural steroid injection. (*Id.* at 251.) Dr. Shah noted that other conservative measures had failed and injection therapy was required to alleviate pain and restore function. (*Id.*) Plaintiff tolerated the procedure well and without complications, and walked without difficulty upon discharge. (*Id.*)

On October 15, 2014, Plaintiff returned to Dr. Shah. (*Id.* at 254.) He reported 20 percent relief from the injection, and his pain level had improved to a constant 6 out of 10. (*Id.*) He continued experiencing mid-back pain and numbness and tingling in his arms and left leg, however. (*Id.*) The mid-back pain would worsen with activity, lifting, and bending. (*Id.*) No significant changes were noted from Plaintiff's physical examination. (*Id.* at 255.) Dr. Shah recommended further injection therapy targeting the bilateral T5-T6 and C6-C7 facet medial branches, and to follow-up with a rhizotomy[12] if relief was obtained. (*Id.*) A chronic pain program would be necessary if Plaintiff did not obtain pain relief from the additional injections, however. (*Id.*)

On October 16, 2014, Plaintiff presented to a licensed psychological associate, Blythe TwoSisters, for a behavioral medicine consultation at the request of Dr. Gardner. (*Id.* at 344.) He rated his average daily pain as a 7 out of 10, which improved to a 5 out of 10 with medication. (*Id.*

---

[12] Rhizotomy is a pain management procedure involving the surgical division of the spinal nerve roots to relieve pain or hypertension. *Rhizotomy*, MCGRAW-HILL CONCISE DICTIONARY OF MODERN MEDICINE (2002).

at 345.)  He described the pain as aches in his left thigh area, stabbing and numbness in his thoracic

spine area, and a "pins and needles" sensation with burning and numbness in his right arm.  (*Id.*)

He rated the level of interference caused by his pain as a 7 out of 10 on his recreational, social, and

familial activities and ability to work, and as a 6 out of 10 with normal activities.  (*Id.*)  Plaintiff

reported difficulty with acts of daily living, including yard work, exercise and playing sports, driving

or sitting more than 30 minutes, standing longer than 40 minutes, bending, lifting or carrying more

than twenty pounds, climbing stairs, and doing household repairs.  (*Id.*)  He rated his current level

of "overall functioning in life" at 50 percent. (*Id.*)

On December 11, 2014, Plaintiff presented to Edward Tang, D.C., for a Workers'

Compensation (WC) designated doctor evaluation.  (*Id.* at 470.)  He reported pain in the neck, mid-

back, right arm, hand, and fingers.  (*Id.* at 473.)  His associated symptoms included numbness in the

right arm, a pins and needles sensation in the mid-back and neck, a tingling sensation in the right

arm and left leg, and a burning sensation in the neck.  (*Id.*)  He rated his current pain as a 7 out of

10, but it ranged between a 6 and an 8 out of 10.  (*Id.*)  Plaintiff's pain was consistent and on/off in

nature, and would worsen with bending, sitting, weather changes, sleeping, pulling, pushing,

stooping, and walking.  (*Id.*)  Dr. Tang noted that he ambulated into the examination room with a

limp to the left, but did not utilize any supportive devices.  (*Id.*)

Palpation of the thoracic spine revealed tenderness and muscular spasm at the right T6-T8

levels.  (*Id.*)  Compression tests of the lateral, anterior, and posterior rib were all positive on the

right.  (*Id.*)  Testing of the spinal dermatomes showed mildly decreased sensation on the right C5

through right C8 nerve distribution. (*Id.*)  Plaintiff was right hand dominant but had weaker right

hand grip strength; strength testing of his right side was fair but normal on the left.  (*Id.* at 959.)  Dr.

Tang opined that Plaintiff reached maximum medical improvement (MMI) on October 6, 2014, and assigned him a 5 percent whole person impairment rating based on the spasms and restricted motion of the thoracic spine, but no evidence of neurological deficits. (*Id.*) Dr. Gardner disagreed with Dr. Tang's certification of MMI and 5 percent impairment rating, however. (*Id.* at 465, 568-69.)

On February 2, 2015, Plaintiff presented to Dr. Gardner for a second FCE. (*Id.* at 321.) He continued showing decreased sense of touch or sensation of the right upper extremity dermatomes, and diminished thoracic range of motion. (*Id.* at 324.) During functional specific testing, he was unable to complete left leg balancing, crawling, crouching, kneeling, overhead reaching, squatting, and stooping. (*Id.*) He performed right leg balancing, shoulder level reaching, sitting for 15 minutes, and standing for 30 minutes, but still experienced increased pain. (*Id.*) Plaintiff was unable to complete cardiovascular treadmill testing because of increased pain and decreased function of his left leg. (*Id.*) Hand grip testing showed diminishing right hand grip strength, and the difference in grip strength between his left and right hands increased to 63 percent. (*Id.*) Pinch grip strength of his left hand was 53 percent more than of his right. (*Id.*)

Dr. Gardner noted that Plaintiff demonstrated a lack of cardiovascular fitness due to deconditioning, but had made objective improvements in static strength and dynamic lifting since the July 2014 evaluation. (*Id.* at 326.) He opined that Plaintiff did not meet the requirements, safety, and performance ability to do his job safely, effectively, and confidently, but would be "capable of returning to gainful employment with restrictions." (*Id.* at 326.) In assessing Plaintiff's ability to work as a delivery driver, Dr. Gardner determined that he could only return to work with the following restrictions: sit with no restrictions; stand 1 to 2 hours with pain; push/pull up to 30 pounds, but not kneel/squat or bend/stoop; walk, climb stairs/ladders, and overhead reach for 1 to

2 hours with pain; reach for 2 to 4 hours with pain; and lift up to 20 pounds occasionally and 10 pounds frequently. (*Id.* at 319-20.)

On February 9, 2015, Plaintiff returned to Dr. Gardner for a WC MMI and impairment rating examination. (*Id.* at 462.) He presented with "moderate residual symptomatology in the thoracic spine region with persistent numbness in the fingers of his right hand." (*Id.* at 463.) Dr. Gardner reported that he was cooperative throughout the examination, and there were no signs of symptom magnification or lack of effort. (*Id.* at 464.) Plaintiff reported difficulties in all his normal activities of daily living. (*Id.*) He was observed having "some difficulties" with range of motion, but there was no evidence of bruising, atrophy, or abnormal growths in the injured area. (*Id.*) Palpation of the mid-back revealed moderate tenderness and measurable restricted range of motion of the thoracic region. (*Id.*) Soft tissue examination of the area of injury was positive for muscle restrictions, trigger points, and vertebral fixations along the thoracic spine. (*Id.*) Plaintiff's diagnoses were displacement of thoracic intervertebral disc without myelopathy,[13] thoracic sprain/strain, and spasm of muscle. (*Id.* at 465.) Dr. Gardner opined that his clinical condition had not stabilized, further material improvement was likely, and he had not reached clinical MMI. (*Id.*) He anticipated the date of MMI to occur following additional pain management, including injections to the affected area, as well as participation in a functional restoration program that could reasonably be completed within a two to three month period. (*Id.* at 466.)

On February 26, 2015, Plaintiff presented to A. Eric Gioia, M.D., for surgical evaluation. (*Id.* at 339.) Dr. Gioia reviewed the June 2014 thoracic CT scan and the July 2014 thoracic MRI and

---

[13] Myelopathy is a spinal cord disorder resulting in severe compression or damage of the spinal cord. *Myelopathy*, JOHNS HOPKINS MEDICINE (Apr. 30, 2019, 10:21 AM), https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy.

found some spondylitic[14] changes in the thoracic region.  (*Id.*)  He noted that there was no study of his cervical or lumbar spine, however.  (*Id.*)  Plaintiff had sustained an earlier work-related cervical injury in 2000, but was able to return to work after two years of conservative treatment.  (*Id.*)  Dr. Gioia reported that "he persists with his present complaints of interscapular pain and intermittent numbness especially of his right arm and low-back pain and dysfunction especially of his left leg with paresthesias[15] and give-way weakness."  (*Id.*)  Plaintiff was observed dragging his left leg and walking with an antalgic gait.  (*Id.*)  Neck extension caused interscapular pain and straight leg raises caused low back discomfort.  (*Id.* at 339-40.)  Dr. Gioia opined that his main complaints were related to the cervical and lumbar spine, and additional imaging of the cervical and lumbar spine would be necessary to rule out any instability.  (*Id.* at 340.)

On February 29, 2015, Plaintiff presented to the emergency room at Huguley with abdominal pain.  (*Id.* at 780.)  Examination of his musculoskeletal symptoms revealed no back or joint pain and revealed normal strength and range of motion.  (*Id.* at 780-81.)  No focal neurological deficit was observed.  (*Id.* at 781.)

In a letter dated March 24, 2015, Dr. Gardner provided his medical opinion on the causation and extent of Plaintiff's injury in connection with his WC claim.  (*Id.* at 555-57.)  He noted that the workplace injury was the cause of his thoracic sprain/strain, thoracic spasms, and thoracic disc syndrome.  (*Id.* at 555.)  Based on his review of the July 1, 2014 lumbar spine MRI, he opined that

---

[14] Spondylitis involves the inflammation of one or more of the vertebrae. *Spondylitis*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

[15] Paresthesia is an abnormal but usually nonpainful sensation typically described as burning or pricking. *Paresthesia*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

Plaintiff sustained a 5 mm dorsal disc herniation at T5-T6, which combined with spondylosis,[16] caused moderate spinal stenosis. (*Id.*) The "mechanism of injury of catching" a 100+ pound package was consistent with T5-T6 disc herniation and moderate spinal stenosis, and "caused compressive and rotational forces to (at least) his thoracic spine which stressed the soft tissues, discs and joint structures of his spine and produced the T5-6 disc herniation." (*Id.*) He further opined that Plaintiff was "prematurely placed at MMI by Dr. Tang," and the additional diagnostic and treatment modalities prescribed by Dr. Gioia would, "in all medical probability, [] help to significantly improve his condition." (*Id.* at 555-56.)

On May 7, 2015, Leigh McCary, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 73-75.) She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop; and frequently balance, kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 73-74.) Dr. McCary referenced Plaintiff's July 1, 2014 thoracic MRI, December 11, 2014 MMI evaluation, and February 9, 2015 MMI evaluation. (*Id.* at 74.) She also noted that his alleged limitations were not fully supported. (*Id.*)

On June 8, 2015, Plaintiff presented to the Dallas Veterans Affairs Medical Center (VA

---

[16] "Spondylosis is a broad term that simply refers to some type of degeneration in the spine." David DeWitt, M.D., *Spondylosis: What It Actually Means*, VERITAS HEALTH (Apr. 11, 2016), https://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means.

Center) with neck pain and right arm numbness.  (*Id.* at 872.)  A cervical spine X-ray showed degenerative disc disease at C6-C7 and degenerative spurring, but no acute fracture or dislocation. (*Id.*)  On June 10, 2015, a second cervical spine X-ray was conducted to look for instability.  (*Id.* at 871.)  No instability was visualized, but there was "degenerative disc disease at C5-C6 and C6-C7 with anterior posterior osteophytes" with potential encroachment on the spinal canal.  (*Id.*)

On July 17, 2015, a cervical spine MRI showed maintained vertebral body height and alignment and a vertebral body hemangioma at T2.  (*Id.* at 866.)  There was partial disc desiccation at all levels with disc height loss at C6-C7, and borderline congenital narrowing of the central canal. (*Id.*)  It was compared with a prior MRI, and the impression was degenerative change in the cervical spine that appeared stable and notable for varying degrees of multilevel central and foraminal narrowing.[17] (*Id.*)  There was also an abnormal right hemicord signal from C4 through T1, presumed to be a syrinx,[18] which was unchanged in appearance.  (*Id.*)  A thoracic spine MRI was also conducted and showed maintained vertebral body height and alignment.  (*Id.* at 868.)  It was compared with a March 20, 2014 MRI, and the notable findings were a T5-T6 central disc extrusion, a T6-T7 central disc protrusion, and mild narrowing of the thecal sac.  (*Id.*)

On July 23, 2015, Plaintiff was seen at the VA Center by a neurosurgery nurse practitioner (NP) for a follow-up.  (*Id.* at 950.)  It was noted that he had sustained a cervical fracture and lower extremity injuries from a jet blast while serving in the Air Force in the 1980s.  (*Id.* at 951.)  Soon after, he experienced pain and numbness in his right arm and leg with slow progression over the

---

[17] The narrowing of the foramina, which are the spaces where the nerve roots travel inside the spine or exit the spine, is known as foraminal stenosis or radiculopathy. *Radiculopathy*, JOHNS HOPKINS MEDICINE (Apr. 30, 2019, 10:23 AM), https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.

[18] A syrinx is "[a] pathologic tubular cavity in the brain or spinal cord with a gliotic lining." *Syrinx*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

years.  (*Id.*)  He described his right arm as feeling "dead" and "persistently asleep."  (*Id.*)  His right arm had always felt weaker than the left, and he was positive for CVA, or costovertebral angle tenderness, and right-sided hemiparesis[19] in 2008.  (*Id.*)  He also had numbness in the left finger tips, as well as intermittent "hot iron rod sensation" down the left arm.  (*Id.*)  His last thoracic injection caused numbness in the left leg, which was his reason for not pursuing additional injections.  (*Id.*)  It was noted that he walked with a mild chronic limp on the right.  (*Id.*)  His right hand grip strength was diminished, and sensation was decreased along a nondermatomal distribution of the right upper extremity and the entire right fingers.  (*Id.*)  His left upper extremity and bilateral lower extremities were intact, and he was negative for Hoffmann,[20] Clonus,[21] and Babinski.[22]  (*Id.*)

Plaintiff was assessed with chronic history of neck pain, bilateral pain, and paresthesias, more right than left.  (*Id.* at 952.)  The NP noted that the jet blast injury might account for his chronic symptoms, but the degree of stenosis was "out of proportion to explain the abnormal cord signal" found in recent imaging studies.  (*Id.*)  Plaintiff had some "moderate neuroforaminal stenosis on the right at C6-7," but no worsening of chronic symptoms.  (*Id.*)  The NP further noted that his disc protrusions at T5-T6 and T6-T7 remained stable compared to a prior MRI, and there was no severe central canal stenosis.  (*Id.*)  He was instructed to continue with his current pain medication

---

[19] "Weakness affecting one side of the body." *Hemiparesis*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

[20] Hoffmann sign or reflex involves "flexion of the terminal phalanx of the thumb and of the second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked." *Hoffmann sign*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

[21] Clonus is "[a]n abnormality in neuromuscular activity characterized by rapidly alternating muscular contraction and relaxation." *Clonus*, THE AMERICAN HERITAGE MEDICAL DICTIONARY (2007).

[22] Babinski sign involves "extension of the great toe and abduction of the other toes instead of the normal flexion reflex to plantar stimulation, considered indicative of corticospinal tract involvement." *Babinski sign*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

14

regimen for chronic pain syndrome.  (*Id.*)

On September 2, 2015, Laurence Ligon, M.D., another SAMC, reviewed the medical evidence.  (*Id.* at 85-87.)  It was noted that since April 2015, Plaintiff had been experiencing constant pain in his arm, with the numbness "becoming longer and longer."  (*Id.* at 80.)  Nevertheless, Dr. Ligon's physical RFC did not differ from Dr. McCary's.  (*Id.*)  He found Plaintiff's alleged limitations partially supported by the medical evidence and other evidence in the file.  (*Id.* at 87.)

On November 4, 2015, Plaintiff presented to David Rees, M.D., at the VA Center for neurologic examination.  (*Id.* at 942.)  Dr. Rees reported that the VA Center had been treating him for neck and back pain, as well as a neurologic condition of both arms described as the "paralysis of middle radicular nerves."  (*Id.*)  He opined that Plaintiff's "neurologic complaints are secondary to his spinal cord myelomalacia,[23]" which was not etiologically related to his military service.  (*Id.*)

On January 8, 2016, Plaintiff saw Siva Vurimi, M.D., at the VA Center for routine evaluation.  (*Id.* at 936.)  He reported left leg numbness that had been constant for a year, as well as chronic neck and lower back pain that he described as numbness, stabbing, and "pins and needles," which increased when sitting too long.  (*Id.* at 938-39.)  Dr. Vurimi's assessment was cervical radiculopathy[24] and displacement of thoracic intervertebral disc without myelopathy.  (*Id.*

---

[23] "Softening of the spinal cord." *Myelomalacia*, STEDMAN'S MEDICAL DICTIONARY (Nov. 2014).

[24]

Cervical radiculopathy is the clinical description of when a nerve root in the cervical spine becomes inflamed or damaged, resulting in a change in neurological function. Neurological deficits, such as numbness, altered reflexes, or weakness, may radiate anywhere from the neck into the shoulder, arm, hand, or fingers. Pins-and-needles tingling and/or pain, which can range from achy to shock-like or burning, may also radiate down into the arm and/or hand.

Zinovy Meyler, D.O., *What Is Cervical Radiculopathy?*, VERITAS HEALTH (Jan. 4, 2019), https://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy.

at 937.)

On May 27, 2016, Plaintiff returned to Dr. Vurimi for a follow-up appointment. (*Id.* at 902.) He continued experiencing chronic neck and upper back pain with numbness in both arms. (*Id.*) He rated his pain level as an 8 out of 10, and described the pain as aching, numbness, sharp, shooting, throbbing, and tingling. (*Id.* at 905-06.) He reported that walking a lot, sitting too long, and bending would increase his pain. (*Id.* at 906.) Dr. Vurimi continued to assess Plaintiff with cervical radiculopathy. (*Id.* at 903.)

On June 20, 2016, Plaintiff presented to the VA Center for a physical therapy consultation. (*Id.* at 901.) He reported having difficulty walking due to cervical pain and bilateral lower extremity weakness. (*Id.*) He had a tendency of falling forward, and would lose balance about once a month. (*Id.*) Physical examination showed limited range of motion of the lower extremity and decreased strength of the lower extremities, worse on the left. (*Id.* at 901.) His gait was antalgic on the left, but he was able to bear full weight with no restrictions. (*Id.*) It was noted that he would benefit from using a bariatric walker for safer ambulation. (*Id.* at 902.)

On August 11, 2016, Plaintiff saw Dr. Vurimi the VA Center for a follow-up appointment. (*Id.* at 898.) Dr. Vurimi noted that he arrived to his appointment with a walker. (*Id.* at 895.) Plaintiff reported that the pain to his neck and "whole back" was "getting worse and worse," and felt like a rod had been inserted from his lower back up through his neck. (*Id.* at 898-99.) He also experienced tingling and numbness in the left leg. (*Id.* at 896.) Dr. Vurimi continued to assess Plaintiff with cervical radiculopathy but also added lumbar spine degenerative joint disease, coronary artery disease, hypertension, hyperlipidemia, and depression/anger issues. (*Id.* at 897.) The Department of Veterans Affairs (VA) assigned him a service-connected disability rating of 90

percent.[25]  (*Id.* at 892.)

**C.    Hearing**

On February 16, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (doc. 11-1 at 52-65.)  He was represented by an attorney.  (*Id.* at 54.)

**1.    Plaintiff's Testimony**

Plaintiff testified that he had attended college for two years and was not currently working.  (doc. 11-1 at 56-57.)  When he arrived at the hearing, he was using a walker prescribed by the VA.  (*Id.* at 56.)  He used it when there was nothing for him to hold onto because he was unstable and would lose his balance.  (*Id.*)  He did not need to use the walker at home, however.  (*Id.*)  He was in pain and had tingling and numbness in his arms and fingers.  (*Id.*)  He received medical treatment from the VA and was receiving VA disability, but had stopped getting WC benefits because his former attorney did not file his paperwork on time.  (*Id.* at 56-57.)  He was taking pain medication, which helped to "numb out" the burning and needle sensation in his arms and fingers, but it made him drowsy.  (*Id.* at 57-58.)  The medication relieved some of his symptoms, but he still experienced pain.  (*Id.* at 58.)  He had "worse pains" when sitting, and could only sit for approximately 15 minutes before experiencing back pain and headaches.  (*Id.*)

Plaintiff had difficulty gripping things with his hands.  (*Id.* at 60.)  He would have to consciously tell his arms to pick something up, or the item would fall out of his hands.  (*Id.*)  He had been struggling with his hands since he left military service in 2000, and had been progressively getting worse.  (*Id.* at 61.)  He lived at home with his wife and helped with "picking stuff up" around

---

[25]  The breakdown of Plaintiff's service connected disability rating by medical impairment was 10 percent to degenerative arthritis of the spine; 50 percent to neurosis; 20 and 40 percent to paralysis of middle radicular nerves; 10 percent to hiatal hernia; 10 percent to tinnitus; and 0 percent to impaired hearing. (*See* doc. 11-1 at 982.)

the house and sometimes with the cooking.  (*Id.* at 62.)  On a typical day, he would sit in front of the computer or television.  (*Id.*)  He drove "every now and then," but his wife drove the majority of the time because he was on muscle relaxers.  (*Id.*)  He fractured his neck when he was in the military and had been receiving disability benefits from the VA for that injury.  (*Id.*)  While working for UPS in 2000, he hit his head on a door, fracturing his skull and re-injuring his neck. (*Id.* at 62-63.)

Plaintiff currently experienced numbness and tingling to his legs, and it worsened throughout the day.  (*Id.* at 63-64.)  He also had neck stiffness and shoulder pain.  (*Id.* at 64.)  He needed a walker because the vertebrae in his back "would move" and caused him pain and twitches.  (*Id.* at 64-65.)  He was also being treated by the VA for his PTSD.  (*Id.* at 65.)  He had a 90 percent VA disability rating.  (*Id.*)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a heavy delivery driver with a SVP of 3.  (doc. 11-1 at 66.)  A hypothetical person with the same age, education, and work experience history as Plaintiff would not be able to sustain his prior work with the following limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequently reach in the bilateral upper extremities; stand and/or walk for four hours; understand, remember, and carry out simple instructions and tasks; and frequently interact with the public, coworkers, and supervisors.  (*Id.* at 66-67.)  There was other available work that the hypothetical person could perform, including cashier II (light and SVP-2) with 80,400 jobs nationally and 6,100 jobs in Texas; hand packager (light and SVP-2) with 76,800 jobs nationally and 7,280 jobs in Texas; and bench assembler (light and SVP-2) with 56,000 jobs nationally and 3,200

jobs in Texas. (*Id.* at 67.) Due to the standing and walking limitation, the number of available jobs was reduced by 90 percent for cashier II; 20 percent for hand packager; and 50 percent for bench assembler. (*Id.*) Those percentages were based on the VE's 22 years in the rehabilitation field interviewing employers and employees about these types of jobs. (*Id.* at 68-69.)

If the hypothetical person required a walker for standing and walking, and would be off task 25 percent of the day because of physical and/or mental symptoms, he would not be able to sustain any other work. (*Id.* at 69.) Other than his percent reduction explanation, the VE's testimony was consistent with the *Dictionary of Occupational Titles* (DOT). (*Id.*)

### D. ALJ's Findings

The ALJ issued a decision denying benefits on June 6, 2017. (*Id.* at 29-51.) At step one, the ALJ found that Plaintiff had met the insured status requirements of the Social Security Act through June 30, 2020, and he had not engaged in substantial gainful activity since the alleged onset date of May 27, 2014. (*Id.* at 31.) At step two, the ALJ found that he had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine; hypertension; coronary artery disease; obesity; depression; anxiety; and PTSD. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the social security regulations. (*Id.* at 32.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, except he could never climb ladders, ropes, or scaffolds. (*Id.* at 35.) He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; stand for four hours and walk for four hours; and frequently reach in the bilateral upper extremity. (*Id.*) He also found that Plaintiff could understand,

remember, and carry out simple instructions and tasks, and frequently interact with the public, coworkers, and supervisors. (*Id*.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work. (*Id*. at 45.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from May 27, 2014, through the date of the decision. (*Id*. at 46.)

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

21

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.  ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.     The decision must be remanded because Plaintiff's cervical and lumbar impairments were not properly considered.

2.     The decision must be remanded because the medical source statement from Plaintiff's treating physician was not properly considered.

3.     The decision must be remanded because the vocational expert testimony cannot be relied on.

(doc. 14 at 2.)

A.    **Severe Impairment**

Plaintiff first argues that the ALJ failed to consider all of his impairments in assessing his RFC. (doc. 14 at 13.) He claims that the ALJ erred because he did not find his cervical and lumbar radiculopathy from herniated discs were severe impairments that affected his ability to perform work-related activities. (*Id*. at 13-17.) The Commissioner responds that the ALJ properly considered these impairments in determining Plaintiff's RFC. (doc. 15 at 7-11.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. In other words, "the claimant [need only] make a de minimis showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient

severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ found that Plaintiff's degenerative disc disease of the cervical, thoracic, and lumbar spine, hypertension, coronary artery disease, obesity, depression, anxiety, and PTSD were severe impairments. (doc. 11-1 at 31.) He did not address or mention Plaintiff's cervical and lumbar radiculopathy from herniated discs at step two. (*See id.*)

### 1.    Lumbar Radiculopathy

Plaintiff primarily relies on his testimony, Dr. Gioia's recommendation for lumbar spine imaging studies, and the VA records mentioning his problem with leg pain, numbness, and weakness as evidence that his alleged lumbar radiculopathy was a severe impairment. (doc. 14 at 17.) Plaintiff testified that he was prescribed a walker by the VA because he felt "unstable" and would lose his balance. (doc. 11-1 at 56.) He experienced numbness and tingling in his legs, which worsened as the day progressed. (*Id.* at 63-64.) In February 2015, Dr. Gioia observed him dragging his left leg and walking with an antalgic gait, and opined that MRI and X-ray studies of the lumbar and cervical spine were needed to negate instability. (*Id.* at 339-40.) The VA medical records show that Plaintiff reported having difficulty walking because of cervical pain and bilateral lower extremity weakness, and he was issued a bariatric walker for safer ambulation. (*Id.* at 901-02.)

Plaintiff has not established that he had lumbar radiculopathy or shown that it was a medical impairment severe enough to interfere with his ability to do work. *Anthony*, 954 F.2d at 294 n.5. He was never formally diagnosed with lumbar radiculopathy, and there were no imaging studies of the lumbar spine in the medical record. The ALJ noted that while he was observed using a walker

at the VA Center in June 2016, he was also able to ambulate independently without the use of an assistive device. (doc. 11-1 at 38, 901.) Substantial evidence therefore supports the ALJ's finding that did not include lumbar radiculopathy as a severe impairment that interfered with his ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments to be non-severe because the ALJ considered the relevant evidence in his decision and the plaintiff did "not point to any evidence in the record indicating that her alleged obesity or hearing loss caused any work-related limitations beyond those already found by the ALJ"). The ALJ did not err.

### 2.    Cervical Radiculopathy

Plaintiff's cervical radiculopathy, on the other hand, could reasonably be said to constitute a "medically determinable impairment" because it was "demonstrable by medically acceptable clinical and laboratory techniques." These included the cervical spine X-rays taken on June 8 and 10, 2014; the cervical spine MRI taken on July 17, 2015; and Dr. Vurimi's cervical radiculopathy assessment in January 2016. (*See* doc. 11-1 at 866, 871-72, 897, 903, 937); *see also* 42 U.S.C. § 423(d)(3) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ's failure to determine the severity of Plaintiff's cervical radiculopathy at step two as required by 20 C.F.R. § 404.1520(a)(4)(ii),(c) was

legal error. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (explaining that violation of a regulation constitutes legal error).

Nevertheless, where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required if the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's — or its symptom's — effects on the claimant's ability to work at those steps. *See, e.g.*, *Herrera*, 406 F. App'x at 3 and n.2 ; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). This approach is consistent with cases holding that an ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [] where the ALJ proceeds past step two in the sequential evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe); *Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process). Accordingly, to obtain remand, Plaintiff must show that the ALJ's step two error was not harmless. *See Garcia v. Astrue*, No. CIV. —08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error."). In the Fifth Circuit, harmless error exists when it is "inconceivable" that a

different administrative determination would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

## B.    Harmless Error

Plaintiff argues that the ALJ's step two error was not harmless because it resulted in an RFC that did not account for his cervical radiculopathy, which "resulted in consistent, severe limitations in the use of his dominant right hand for fingering, grasping, lifting, and carrying." (doc. 14 at 20.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates

27

that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ determined that Plaintiff had the RFC to perform light work, except he could never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; stand for four hours and walk for four hours; frequently reach in the bilateral upper extremity; understand, remember, and carry out simple instructions and tasks; and frequently interact with the public, coworkers, and supervisors. (doc. 11-1 at 35.) He explained that he assessed the RFC "based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments," and "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" including opinion evidence.

(*Id.*)

The ALJ referenced Plaintiff's hearing testimony that he had persistent neck issues, back and leg problems, and pain in his fingers and hands that caused burning, tingling, and numbness, but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 36.) He noted that Plaintiff received conservative treatment after his May 2014 back injury. (*Id.* at 37.) He also noted that despite receiving an epidural steroid injection in his thoracic spine, he continued complaining of pain over his shoulder blade and middle back, as well as numbness and tingling in his arms. (*Id.*)

The ALJ also noted that the May 27, 2014 thoracic spine X-ray "showed no acute fracture or subluxation;" the June 10, 2014 thoracic spine CT showed degenerative anterior endplate spurring of the upper spine; the July 1, 2014 thoracic spine MRI showed multilevel degenerative disc disease; and the July 18, 2015 thoracic spine MRI showed degenerative changes in the thoracic spine that remained overall stable in appearance. (*Id.*) Nevertheless, he determined that the diagnostic imaging studies showed "only minimal findings" that did "not support the claimant's alleged level of pain, discomfort, and incapacity." (*Id.*) The ALJ acknowledged that Plaintiff exhibited limited range of motion, pain with facet loading, and tenderness around the paraspinal region during thoracic spine examinations in July 2014 and October 2014, but considered his physical examination results "generally within the normal limits" with no evidence of debilitating findings. (*Id.*) He also noted that the examinations "showed relatively normal findings and minimal evidence to support the inability to effectively perform activities of daily living." (*Id.*) He highlighted the fact that an examining physician found Plaintiff to have reached MMI as of October 2014. (*Id.*)

After summarizing the examinations and imaging studies of Plaintiff's thoracic spine, the ALJ found that the evidence did not support his allegations that he was "having problems gripping things, and the only way he can pick something up is to physically look at it and tell his arms to pick it up." (*Id.* at 37.) The ALJ noted that in February 2015, he was also diagnosed with displacement of thoracic intervertebral disc without myelopathy, thoracic sprain/strain, and spasm of muscle, and his treating physician opined that he had not reached a stable clinical condition. (*Id.* at 38.) He also referenced the medical treatment notes from the VA Center, which reported Plaintiff's worsening cervical pain on exertion in June 2016. (*Id.*)

The ALJ determined that "while the claimant's 'severe' impairments were capable of producing pain or other symptoms that would interfere with the ability to perform basic work activities, they could not reasonably be expected to give rise to the level of disabling limitations the claimant actually alleged." (*Id.*) In light of the pain and limited range of motion resulting from his degenerative spine disease, the ALJ limited him to light level lifting and carrying. (*Id.* at 39.) He also accounted for Plaintiff's obesity by limiting him to standing/walking for four hours and included additional limitations for climbing and other postural functions. (*Id.*) He concluded that the physical limitations in the RFC were fully supported by "the ample longitudinal evidence of treatment, improvement, and examination results indicating normal results." (*Id.*)

The ALJ's RFC discussion did not address or mention Plaintiff's alleged cervical radiculopathy. The evidence before him included the treatment notes from various medical providers showing that Plaintiff consistently reported tingling and weakness of his right hand and fingers. (doc. 11-1 at 252, 254, 324, 330, 339, 345, 433, 441-42, 447-48, 463, 473, 942, 951.) Despite being right-sided dominant, the results from strength testing further demonstrated that his

right hand was significantly weaker compared to his left hand. (*Id.* at 324, 332, 951, 959.) Although the ALJ referenced the radiological and diagnostic findings relating to his *thoracic* spine, there was no reference to, or discussion of, the imaging studies of his *cervical* spine.

A June 8, 2015 cervical spine X-ray showed changes of degenerative disc disease and degenerative spurring at C6-C7. (*Id.* at 872.) A cervical spine X-ray conducted the following month confirmed degenerative disc disease at C6-C7 and further showed degenerative disc disease at C5-C6 "with anterior posterior osteophytes which may encroach on the spinal canal." (*Id.* at 871.) A July 17, 2015 cervical spine MRI was noted as abnormal and showed degenerative change in the cervical spine as well as a T2 hyperintense signal within the right hemicord from C5 through C7-T1 level. (*Id.* at 866.) Although Plaintiff was later assessed with cervical radiculopathy by Dr. Vurimi in January 2016, the diagnosis was not referenced in the ALJ's decision. (*Id.* at 897, 903, 937.)

Because the ALJ did not reference this evidence in assessing Plaintiff's RFC, it is unclear whether he accounted for the effects of his cervical radiculopathy on his ability to perform work-related functions as required by the regulations. *See* 20 C.F.R. § 404.1545(a)(1)-(3). Consequently, it is unclear whether he considered the effects that this impairment may have on his ability to work at step five.[26] Although he restricted Plaintiff to light work with the added limitations of never climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and standing for four hours and walking for four hours, it is not inconceivable that the ALJ would have imposed greater restrictions in his RFC if he had considered

---

[26] It is also unclear whether the RFC was supposed to include additional limitations to account for the impairments related to cervical radiculopathy. Later in the decision, he stated that he limited Plaintiff's "handling and fingering in light of his degenerative cervical disease," but the RFC did not include any manipulative limitations. (*See* doc. 11-1 at 39.) Nevertheless, an ALJ's decision "must stand or fall with the reasons set forth in [his] decision, as adopted by the Appeals Council," however. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

the effects of his cervical radiculopathy.  If the ALJ had posed a hypothetical with a stricter RFC to the VE, the VE's testimony regarding Plaintiff's ability to perform the jobs of "cashier II," "hand packager," and "bench assembler" might have been different.

In conclusion, because it is not inconceivable that the ALJ would have reached a different determination at step five absent his step-two error, the error was not harmless.  *See Corbitt v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-558-CWR-LRA, 2013 WL 603896, at *5-6 (S.D. Miss. Feb. 19, 2013) (remanding where the "ALJ's decision show[ed] that he did not seriously consider the specific problems" that the claimant's "diabetes create[d]" either at step two or "in the remainder of the five-step evaluation process to justify a finding of harmless error"); *compare to Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (finding "no ground" for remand where "the ALJ acknowledged" the claimant's alleged "significant impairment" at step two but found it to be non-severe, and "went on to find, pursuant to the fourth step of the sequential evaluation analysis, that [the] impairment did not disable [her] from performing her past sedentary work"); *Boothe v. Colvin*, No. 3:12-CV-5127-D, 2013 WL 3809689, at * 5-6 (N.D. Tex. July 23, 2013) , at *5 (finding that any step-two error was "harmless because the ALJ considered [the alleged] conditions in his RFC analysis").[26]

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED IN PART**, and the case should be **REMANDED** for further proceedings.

---

[26]  Because this error requires remand and determination of Plaintiff's severe impairments on remand will likely affect the remaining issues, they will not be addressed here.

**SO RECOMMENDED** on this 3rd day of May, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

33